UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                   :

CVD EQUIPMENT CORPORATION,          :
                                   :

                        Plaintiff,   :
                                   :        10-CV-573 (JPO)

                -v-                   :
                                   :      OPINION AND ORDER

TAIWAN GLASS INDUSTRIAL            :
CORPORATION and MIZUHO CORPORATE  :
BANK, LTD.,                         :
                                   :

                        Defendants. :
------------------------------------------------------------ X
                                   :

TAIWAN GLASS INDUSTRIAL            :
CORPORATION,                      :
                                   :

             Counterclaim Plaintiff,   :
                                   :

                -v-                   :
                                   :

CAPITAL ONE, N.A.,               :
                                   :

            Counterclaim Defendant.  :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

      This is a case, as has been noted before, about "a commercial transaction gone wrong."

*CVD Equip. Corp. v. Taiwan Glass Indus. Corp.*, 2011 WL 1210199, at *1 (S.D.N.Y. Mar. 31,

2011).  Presently before the Court is the second motion for partial summary judgment by

Defendant Taiwan Glass Industrial Corporation ("Taiwan Glass") against Plaintiff CVD

Equipment Corporation ("CVD").  On this motion, Taiwan Glass seeks summary judgment on both CVD's breach of contract claim and its counterclaim for breach of contract against CVD.[1]

For the reasons that follow, Taiwan Glass's motion is granted.

## I.    Background

### A.    Factual Background

The following facts are drawn, unless otherwise indicated, from the parties' Rule 56.1 Statements and the submissions made in connection with the instant motion.  Only the facts relevant to this motion are provided.  The facts are undisputed unless otherwise noted.

CVD is a technology company based in Long Island, New York.  Its principal facility, at all relevant times, was in Ronkonkoma, New York.  CVD's expertise includes the deposition of thin films on various kinds of surfaces, including via a process called "chemical vapor deposition."  Taiwan Glass, as its name suggests, has its principal place of business in Taiwan and specializes in the manufacturing of glass.

#### 1.  The "APCVD System"

The process for glass production at Taiwan Glass's factory in Lukang, Taiwan—where CVD's equipment was to be ultimately installed—is known as the "float glass" method.  In a "float glass" line, raw materials are mixed at very high temperatures and then formed in a "tin bath" to create a sheet of glass.  The sheet then passes through a "lehr"—a long kiln—which cools and strengthens (or "anneals") the glass.  Finally, the sheet is cut into individual panels and stored.[2]

---

[1] This motion does not address Taiwan Glass's counterclaims against CVD for tortious interference with contract and fraud, or its counterclaim against Capital One for wrongful dishonor of a letter of credit.

[2] This description is based on the summary contained in Taiwan Glass's 56.1 Statement.  (*See* Dkt. No. 187, Rule 56.1 Statement of Taiwan Glass ("Def. 56.1 Stmt"), ¶ 3.)  CVD objects to

In mid- to late 2007, Taiwan Glass sought a company to design and build a chemical vapor deposition system for its Lukang factory.  The envisioned system would deposit chemical films on sheets of glass during production to create two types of glass: Low-Emission Glass ("Low-E") and Transparent Conductive Oxide Glass ("TCO").  (Def. 56.1 Stmt, ¶ 4.)  (TCO glass is generally used for solar panels, while Low-E glass is typically employed for insulation purposes.)  The system would be "online," in the sense that it was to be a component of the factory's manufacturing production line.

In June 2008—following meetings with, and a presentation by, CVD—Taiwan Glass signed an order confirmation with CVD for a "Continuous TCO Atmospheric Pressure Chemical Vapor System" (the "APCVD System").  Taiwan Glass and CVD then entered into an agreement dated August 29, 2008 (Def. 56.1 Stmt, Ex. 3 ("Agreement")), under which CVD would design and manufacture the APCVD System for a sum of $11,880,000.

On or about September 15, 2008, at Taiwan Glass's request, Mizuho Corporate Bank, Ltd. ("Mizuho") issued a letter of credit (the "Commercial LC") in CVD's favor for $11,880,000.  Reciprocally, on or about October 8, 2008, Capital One, N.A. ("Capital One") issued a standby letter of credit (the "Standby LC") on CVD's behalf to Taiwan Glass for

---

this summary on the grounds that it is a "'shorthand' description of complex technological processes" and "omit[s] many significant facts relating to the subject technology."  (Dkt. No. 196, Corrected CVD Equipment Corporation's Local Rule 56.1 Counter Statement ("Pl. 56.1 Stmt"), at 3–4.)  CVD raises similar objections elsewhere in its 56.1 Statement.  (*See id.* at 6–9).  However, CVD neither offers ostensibly more complete or accurate descriptions of the relevant technological processes, nor supports its objections with citations to admissible evidence.  *See* Local Rule 56.1(d).  Where CVD's objections are deficient under Rule 56.1, the Court adheres to the facts set out in Taiwan Glass's 56.1 Statement for purposes of this motion.

$3,564,000—30% of the total purchase price.[3]  Once Capital One issued the Standby LC, CVD drew down on the Commercial LC for the same amount.  (Pl. 56.1 Stmt, at 5.)

The design of the proposed APCVD System was complex.  The system was to be online, coating the glass sheets before they reached the annealing lehr.  (Def. 56.1 Stmt, ¶ 11.) According to a schematic drawing prepared by CVD (Def. 56.1 Stmt, Ex. 8.)—which CVD contends was "preliminary" and incomplete (Pl. 56.1 Stmt, at 6, 19)—the system contained its own heating unit (the "Deposition Lehr") responsible for maintaining the temperature of the glass.  Within the Deposition Lehr would be a "Deposition Module," depositing gaseous chemicals that would combine to form a thin film over the entire sheet of glass.  The Deposition Module was to consist of several "injector modules," each of which would house its own "deposition head" and "deposition nozzle."  (Def. 56.1 Stmt, ¶ 14.)

Given that the primary purpose of the APCVD System was the deposition of chemicals onto the glass, it was understood that the components of the system that accomplished this purpose were the most critical.  For example, K.S. Chang, a Taiwan Glass engineer at the Lukang factory, described the deposition nozzle—the piece of the system that would actually spray the chemicals onto the glass—as "one of the most important components" of the system. (*Id.* ¶ 17.)  Karlheinz Strobl—CVD's Vice President for Business Development and the "principal scientist for the APCVD thin coating technology"—referred to the Deposition Module as the "heart" of the APCVD System.  (*Id.* ¶ 19.)

---

[3] Like other standby letters of credit, the Standby LC was a form of security under which Taiwan Glass was guaranteed a refund of the first installment of payment in the event that CVD was unable to perform its obligations under the contract.

### 2.  The Inspection and Shipment

Section 6.14 of the Agreement laid out a "Preliminary Manufacturing Schedule," which divided the project into six stages and stated "goals for each stage."  (Agreement, at 18–19.)  Among these goals was the design and construction of an "R&D APCVD," which, Taiwan Glass says, was to include a prototype of the Deposition Module and its constituent parts.[4]  (Def. 56.1 Stmt, ¶ 20.)  However, in 2009, CVD made changes to the proposed design of the APCVD System and so informed Taiwan Glass.  (*Id.* ¶¶ 21–22.)  CVD concedes that it neither provided a copy of the new design to Taiwan Glass nor physically manufactured the R&D prototype, but says that the R&D system was not a "deliverable item" under the Agreement.  (Pl. 56.1 Stmt, at 9–10, 19.)

Under the terms of the Agreement, CVD was entitled to payment of the second 30% of the purchase price following "Shipping and Testing at Seller's Facility and acceptance for shipping by Buyer."  (Agreement, at 3.)  Section 6.2 of the Agreement, entitled "Pre-Shipment Inspection," says the following: "Customer visits during construction are encouraged.  Prior to shipment we invite customers to our facility to view complete final check out of the system and its ability to meet the specifications mentioned herein."  (*Id.* at 11.)  On October 28, 2009, as required by the Standby LC, Taiwan Glass wrote to CVD instructing the latter to arrange shipment of the APVCD System.  (Def. 56.1 Stmt, Ex. 16.)  However, Taiwan Glass stressed (in bolded and underlined typeface) that CVD must not ship the system without first obtaining "[t]he acceptance for shipping issued by [Taiwan Glass]."

---

[4] Section 6.14 of the Agreement makes reference to the design and manufacture of an R&D APCVD system, but says nothing about its constituent parts.

Approximately a month later, on November 23 and 24, 2009, several Taiwan Glass employees, including Chang, visited CVD's facility for an inspection.  (Pl. 56.1 Stmt, at 12.)  CVD concedes that, at the time of the inspection, it had not physically manufactured or assembled several components of the APCVD System.  (*Id.* at 12–13.)  In particular, the Taiwan Glass employees were informed that the Deposition Module was not available for inspection, and that components of the module would be "added later in Taiwan."  (Def. 56.1 Stmt, ¶ 36.)  Neither did CVD produce a completed version of the R&D APCVD or samples of TCO glass from the R&D system (*id.* ¶¶ 39–40), though CVD disputes whether it was obligated to provide such samples (Pl. 56.1 Stmt, at 19).  Following the inspection, Chang advised Strobl that he and the other employees were "not authorized to sign acceptance of the shipment to [Taiwan Glass] and that CVD should therefore not ship the system."  (Def. 56.1 Stmt, ¶ 42.)  Nonetheless, on or about November 27, 2009, CVD packed the parts of the APCVD System that had been available for inspection by Taiwan Glass into three shipment containers and had them sent to Taiwan shortly thereafter.  Around the same time, CVD arranged for shipment of certain other parts from its suppliers in China directly to Taiwan.  The shipments concededly did not include all the components of the system, including the Deposition Module.  (Pl. 56.1 Stmt, at 15–16.)

Both parties subsequently—and unsuccessfully—attempted to obtain payment: CVD under the Commercial LC for the second installment of the purchase price, and Taiwan Glass under the Standby LC for the 30% initially paid to CVD.  Taiwan Glass sought payment on the stated grounds that CVD had been "unable to meet [the] test requirement" and had shipped the goods in the absence of "acceptance for shipping issued by [Taiwan Glass]."  (Def. 56.1 Stmt, ¶ 48.)  Taiwan Glass refused to clear the CVD shipment through customs, and it was ultimately

shipped back to CVD.  (*Id.* ¶ 51.)  On January 22, 2010, CVD wrote to Taiwan Glass to confirm rejection of the goods.  (Def. 56.1 Stmt, Ex. 19.)

      **B.**      **Procedural History**

      CVD filed the instant action on January 26, 2010 against Taiwan Glass and Mizuho, alleging breach of contract and wrongful dishonor, respectively.  (Dkt. No. 1.)  Taiwan Glass filed a counterclaim against CVD for breach of contract on April 15, 2010, and against Capital One for wrongful dishonor on August 31, 2010.  (Dkt. Nos. 12 & 32.)  Mizuho moved for summary judgment against CVD on July 28, 2010.  (Dkt. No. 26.)  CVD cross-moved for summary judgment against Mizuho on August 31, 2010.  (Dkt. No. 33).  On January 28, 2011, Capital One moved to dismiss Taiwan Glass's counterclaim, and Taiwan Glass cross-moved for summary judgment on the same.  (Dkt. Nos. 60 & 64.)

      This action has generated three opinions to date.  In an opinion dated March 31, 2011, Judge Holwell (to whom this matter was previously assigned) granted Mizuho's motion for summary judgment—and denied CVD's cross-motion for summary judgment—on all claims with respect to Mizuho.  *CVD Equip. Corp. v. Taiwan Glass Indus. Corp.*, 2011 WL 1210199, at *4 (S.D.N.Y. Mar. 31, 2011).  Additionally, Judge Holwell denied both Capital One's motion to dismiss and Taiwan Glass's cross-motion for summary judgment as to Capital One.  *Id.* at *6.

      On April 12, 2012, Taiwan Glass moved for partial summary judgment on the issue of whether the Commercial LC—specifically, its deadline for shipment—was incorporated into the Agreement.  (Dkt. No. 96.)  In an opinion dated November 7, 2012, this Court denied the motion. *CVD Equip. Corp. v. Taiwan Glass Indus. Corp.*, 2012 WL 5506120 (S.D.N.Y. Nov. 7, 2012).

      On July 12, 2013, Capital One moved for summary judgment on Taiwan Glass's counterclaim.  (Dkt. No. 130.)  The Court denied the motion in an opinion dated February 19,

2014.  *CVD Equip. Corp. v. Taiwan Glass Indus. Corp.*, 2014 WL 641420 (S.D.N.Y. Feb. 19, 2014).

      Taiwan Glass filed this motion for partial summary judgment on July 15, 2014.  (Dkt. No. 186.)  CVD filed an opposition on August 14, 2014, and Taiwan Glass filed its reply on August 27, 2014.  (Dkt. Nos. 197 & 204.)

## II.    Discussion

### A.    Standard of Review

      Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and there is a genuine issue for trial where, considering the record as a whole, a rational trier of fact could find in favor of the non-moving party, *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

      "It is the movant's burden to show that no genuine factual dispute exists," and the court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor."  *Vt. Teddy Bear Co., Inc. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  If the movant meets its burden, the burden shifts to the non-moving party to demonstrate that there is, in fact, a genuine issue for trial.  *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001) (per curiam) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).  A court cannot "weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact" on a motion for summary judgment, but neither can it permit the non-moving party to rely upon "conclusory statements, conjecture,

or speculation." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (quoting *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995)) (internal quotation marks omitted).

**B.     The Applicable Law**

A threshold issue on this motion concerns the source of law governing the contract claims in this dispute.  Taiwan Glass argues that Article 2 of the Uniform Commercial Code ("UCC") applies, while CVD insists that New York common law governs.  Having reviewed the parties' briefing in their respective pre-trial memoranda (Dkt. Nos. 154 & 170) and their papers submitted on this motion (Dkt. Nos. 186, 197 & 204), the Court concludes as a matter of law that the Agreement is a contract primarily for goods, and is accordingly governed by the UCC.

Article 2 of the UCC applies to "transactions in goods."  N.Y. U.C.C. § 2-102.[5]  Where a contract involves a mix of goods and services, whether Article 2 is applicable turns on the "essence" or "main objective" of the parties' agreement.  *Medinol Ltd. v. Boston Sci. Corp.*, 346 F. Supp. 2d 575, 593 (S.D.N.Y. 2004) (citing *Dynamics Corp. of Am. v. Int'l Harvester Co.*, 429 F. Supp. 341, 346 (S.D.N.Y. 1977)); *see also Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737 (2d Cir. 1979)).  Where the provision of the service "predominates" and the sale of items is merely "incidental," the contract is one for services.  *Triangle Underwriters*, 604 F.2d at 742 (quoting *N. Am. Leisure Corp. v. A & B Duplicators, Ltd.*, 468 F.2d 695, 697 (2d Cir. 1972)) (internal quotation marks omitted).

Taiwan Glass draws this Court's attention to the Second Circuit's decision in *Triangle Underwriters*, which considered the issue in the context of analogous facts.  The contract there

---

[5] "Goods" are defined, in relevant part, as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action."  N.Y. U.C.C. § 2-105(1).

required the defendant to supply the plaintiff with a sophisticated computer system that—much like the APCVD System—was designed specifically for the plaintiff and consisted of both hardware and software components. *Id.* at 739. The court concluded that the contract was one for goods rather than services.

Three factors were central to the court's conclusion. *Id.* at 743; *see also St. Anne-Nackawic Pulp Co. v. Research-Cottrell, Inc.*, 788 F. Supp. 729, 733–34 (S.D.N.Y. 1992) (applying the three-factor test). First, the fact that goods were the subject of the contract was reflected in the very title of the contract: "Agreement for the Sale of Data Processing Equipment." *Triangle Underwriters*, 604 F.2d at 743. Second, the agreement contemplated not that the defendant would run an ongoing service for plaintiff, but instead that it would "develop a completed system and deliver it 'turn-key' to [the plaintiff] to operate." *Id.* (quoting *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 457 F. Supp. 765, 769 (S.D.N.Y. 1978)). The defendant's only major obligation to the plaintiff following installation of the system was maintenance. *Id.* Third, the purchase price of the hardware made up all of the defendant's compensation; the defendant "did not bill for services prior, during or subsequent to installation." *Id.*

In each of these respects, the Agreement here is akin to the contract in *Triangle Underwriters*. While the contract's formal name is "Agreement No. CVD – 5702G," the cover letter to the Agreement describes it as a "formal Agreement on a continuous [APCVD] module." (Agreement, at 2.)

Second, the Agreement envisioned that CVD would simply design, manufacture, and deliver the APCVD System to Taiwan Glass. The Agreement provides that CVD would install the system and train Taiwan Glass personnel in its operation (*id.* at 11–12), but nowhere does the Agreement indicate—and nor is it alleged by CVD—that CVD would be responsible for

providing an ongoing service to Taiwan Glass.  CVD's obligations following installation of the

APCVD System were to be confined to warranty repairs and technical support.  (*Id.* at 12.)

Moreover, the Agreement expressly provides that CVD is to retain all of the intellectual property

underlying the APCVD System[6]—buttressing Taiwan Glass's argument that the parties

contracted for goods, not services.

Finally, the only service for which Taiwan Glass billed CVD, apart from installation, was

"[t]raining at [Taiwan Glass's] facility."  (*Id.* at 3.)  The cost of that service—$10,000—is

negligible in the context of the overall contract, worth almost $12 million.  (*Id.*)  In short, none of

the relevant factors suggests that the Agreement is a contract for services.

In support of its argument that the Agreement is a contract for services—and is therefore

outside the scope of the UCC—CVD relies almost exclusively on *TK Power, Inc. v. Textron,*

*Inc.*, 433 F. Supp. 2d 1058 (N.D. Cal. 2006).  There, the defendant sought to have the plaintiff

develop and produce battery chargers for electric golf carts.  *Id.* at 1060.  At the first stage of the

contract, the plaintiff was required to provide working prototypes of the product for laboratory

testing.  *Id.*  The court concluded that this portion of the contract was, in essence, one for

services.  *Id.* at 1064–65.  Emphasizing that the bulk of the contract price was for the

development of software code and that the prototypes were designed merely for testing (rather

than use by the defendant or sale to consumers), the court explained that the defendant had

---

[6] *See* Agreement, at 16 ("Taiwan Glass agrees not to copy or duplicate the design of the system
or transfer information to any other party that will copy and manufacture our design. . . .  Taiwan
Glass agrees that any and all inventions, discoveries, developments and innovations conceived
by CVD Equipment Corporation during this engagement relative to the duties under this
Agreement shall remain the exclusive property of CVD Equipment Corporation; and CVD
Equipment Corporation does not assign any rights, title, and interest in the same to Taiwan
Glass. Any and all inventions, discoveries, developments and innovations conceived by CVD
Equipment Corporation prior to the term of this Agreement and utilized by them in rendering
duties to Taiwan Glass are hereby also not licensed to Taiwan Glass for use in its operations.")

bargained less for material goods and more for the plaintiff's "knowledge, skill and ability." *Id.* at 1062.

Even were the California federal court's interpretation of California law persuasive, *TK Power* is inapposite. The court's conclusion that the UCC did not apply was limited to the portion of the contract dealing with prototypes.[7] In contrast, it is undisputed that the APCVD System was designed for usage in Taiwan Glass's Lukang factory. In addition, as noted above, CVD retained rights to all of the intellectual property underlying the APCVD System. Even crediting CVD's contention that it was engaged to design "a new, state-of-the-art technology from scratch" (Dkt. No. 154, Plaintiff's Pre-Trial Memorandum of Law ("Pl. PTM"), at 16), this fact does not, without more, convert a contract for goods into one for services. *See St. Anne-Nackawic Pulp Co.*, 788 F. Supp. at 733–34 ("[T]he sophisticated and customized nature of the equipment does not make it any less a good." (citing *Triangle Underwriters*, 604 F.2d at 743)).

Accordingly, the Court concludes as a matter of law that the Agreement was a contract for the sale of goods, and that Article 2 of the UCC governs the contract claims in this action.

### C.    The Contract Claims

The principles governing summary judgment in the context of a contract dispute are well established. Summary judgment is appropriate only "if the language of the contract is wholly unambiguous." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 257 (2d Cir. 2002) (quoting *Mellon Bank v. United Bank Corp.*, 31 F.3d 113, 115 (2d Cir.1994)) (internal quotation mark omitted). "If the language is susceptible to different reasonable interpretations, and 'where there is relevant extrinsic evidence of the parties' actual intent,' then the contract's meaning becomes

---

[7] Indeed, the parties in *TK Power* agreed that the UCC would have governed the portion of the contract dealing with the mass production and sale of the chargers. *Id.* at 1063.

an issue of fact precluding summary judgment." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993).

Whether a writing is ambiguous is a question of law within the purview of the court. *Lucente*, 310 F.3d at 257. Ambiguity exists where the language of the contract is "capable of more than one meaning when viewed objectively by a reasonably intelligent person" within the context of both the entire agreement and the customs and terminology of the particular trade or business. *Sayers*, 7 F.3d at 1095 (internal quotation marks omitted). In contrast, no ambiguity exists where the contract has "a definite and precise meaning, unattended by danger of misconception . . . and concerning which there is no reasonable difference of opinion." *Id.*

On summary judgment, Taiwan Glass identifies four particular instances of breach by CVD: its failure to deliver the APCVD System at inspection, its shipment of the equipment in the absence of acceptance by Taiwan Glass, its failure to deliver the APCVD System by the delivery date, and its attempt to draw upon the Commercial LC upon shipment.[8] Taiwan Glass also seeks summary judgment on CVD's breach of contract claim.

The Court concludes that there is no genuine dispute that CVD breached the Agreement in at least some of these respects, and that Taiwan Glass was therefore entitled to reject the goods. Further, it is beyond genuine dispute that Taiwan Glass did not breach the Agreement.

### 1. The Inspection Provision

To begin with, there is genuine disagreement as to the significance of the "Pre-Shipment Inspection" provision at § 6.2 of the Agreement. As discussed above, this provision "invite[d]"

---

[8] *See* Dkt. No. 190, Memorandum of Taiwan Glass Industrial Corporation in Support of its Motion for Partial Summary Judgment ("Def. Memo"), at 24. Taiwan Glass notes that "[t]here were numerous other breaches of the contract by CVD, but this litany suffices for present purposes." (*Id.*) The Court confines its analysis here to the identified breaches.

Taiwan Glass to "view complete final check out of the system and its ability to meet the specifications mentioned herein." (Agreement, at 11.) Taiwan Glass contends that inspection was a precondition to shipment of the system and collection of payment. (Def. Memo, at 9–10.) Accordingly, CVD's failure to make the APCVD System available for inspection at CVD's headquarters, Taiwan Glass asserts, constituted a breach of the Agreement. CVD, however, reads the provision as merely inviting Taiwan Glass to visit CVD's factory, without imposing a legal obligation on CVD to demonstrate the full operation of the APCVD System. (Dkt. No. 197, Memorandum of Law in Opposition to the Second Motion for Partial Summary Judgment ("Pl. Opp."), at 6.)

In truth, the Agreement is not a model of clarity, and it fails to define the specific content of CVD's obligation under § 6.2. CVD's position has some merit: the statement that customer visits "are encouraged" and the use of the term "invite" suggests that inspection is a mere option with no legal consequence, and nothing in the provision indicates—as one might expect it to— that full operation of the APCVD System at inspection is required. CVD also says that Taiwan Glass understood that demonstration of the full operation of the system prior to shipping was neither possible nor expected. It was not *possible*, CVD says, because of the limitations of CVD's facility and the fact that the system's functionality depended on integration into Taiwan Glass's float glass line. (Dkt. No. 195, Decl. of Leonard Rosenbaum in Opposition to Motion for Partial Summary Judgment, ¶¶ 6, 27.) It was not *expected* based on the prevailing norms in the industry. (*Id.* ¶¶ 32–33.)

However, cutting against CVD's interpretation is language elsewhere in the contract. For example, payment of the second 30% of the purchase price is conditioned on "*Shipping and Testing at Seller's Facility* and acceptance for shipping." (Agreement, at 3 (emphasis added).)

Moreover, among the "goals" or "tasks" that CVD "expect[ed] to finish" at stage five of the "Preliminary Manufacturing Schedule" was a pre-shipment "Final Test of Online APCVD System and [Taiwan Glass] factory sign off." (*Id.* at 19.)  This language suggests that the Agreement contemplated some kind of pre-shipment inspection, even though the particulars of such an inspection were not spelled out.

In short, whether CVD was obligated to provide a pre-shipment inspection—and if so, what it was required to demonstrate at that inspection—are issues of material fact as to which there is genuine dispute.

### 2.  Shipment in the Absence of "Acceptance"

Notwithstanding the above, it is beyond genuine dispute that CVD breached the contract by failing to obtain Taiwan Glass's "acceptance," as required by the Agreement, before shipping the components of the APCVD System.

As noted above, the terms of the Agreement unambiguously identify "acceptance for shipping by [Taiwan Glass]" as a condition to payment of the second installment of the purchase price.  (Agreement, at 3.)  Taiwan Glass's explanation of the logic underlying this condition is persuasive: it provided Taiwan Glass with one last opportunity, before paying the next 30% installment and shutting down its production line to install the APCVD System, to protect itself in the event that it was not going to get what it had bargained for.  And there is no true dispute that Taiwan Glass withheld its acceptance for shipping.  As Strobl himself noted in his post-inspection report, Chang and the other employees advised that "they [were] not authorized to sign acceptance of shipment to [Taiwan Glass] and that CVD should therefore not ship the system."  (Def. 56.1 Stmt, ¶ 42.)

CVD does not meaningfully contest that this language of the contract created an obligation upon it to secure a pre-shipment approval from Taiwan Glass.[9]  Instead, it takes the position on summary judgment that Taiwan Glass "accepted" shipment when it represented to Capital One in its October 28 letter—in accordance with the terms of the Standby LC—that it had instructed CVD to ship the equipment.[10]  (Pl. Opp., at 3, 24.)

That argument is confused.  The relevant term of the Standby LC is item 46A, which required Taiwan Glass to produce a "copy of [the] request sent to [CVD] instructing them to ship 'Continuous TCO APCVD System and Exhaust Gas System' dated not later  November 1, 2009 [sic]."  (Def. 56.1 Stmt, Ex. 7, at 1.)  The purpose of this term was, presumably, to ensure that Taiwan Glass had held up its end of the bargain before allowing it to recoup its payment.

There is no indication that the parties understood this instruction to ship as fulfilling the contractual requirement that Taiwan Glass provide a pre-shipment "acceptance" of the goods. On the contrary, Taiwan Glass's October 28 letter clearly instructed CVD to ship the system *on the condition that* it received the requisite "acceptance" from Taiwan Glass.  (Def. 56.1 Stmt, Ex. 16.)  Nor does CVD's position comport with common sense.  As Taiwan Glass observes, the instruction in the Standby LC came before it could know whether CVD did, in fact, have a system to ship.  It would be an odd result if, in seeking to fulfil the formal requirements of the

---

[9] In its papers opposing Taiwan Glass's motion, CVD says: "*Nothing in paragraph 6.2* makes inspection (or "acceptance" of the inspected equipment) a condition precedent to shipping."  (Pl. Opp., at 6 (emphasis added).)  That much may be true, but CVD fails to explain why the key language *on the third page of the Agreement*—which makes payment conditional on "acceptance for shipping"—does not create such a condition precedent.

[10] In its previous filings, CVD conceded that Taiwan Glass withheld its acceptance, but alleged that it did so wrongfully.  (*See, e.g.*, Dkt. No. 1, Complaint, ¶ 46 (referring to Taiwan Glass's "bad faith attempts to force CVD to accept additional conditions not in the Contract," including "withholding the formal acceptance for shipping"); Pl. PTM, at 2 ("[Taiwan Glass] breached the contract in bad faith, refusing to provide its acceptance for shipment . . . .").)

Standby LC—the purpose of which is to protect Taiwan Glass against nonperformance by CVD—Taiwan Glass concurrently provided the "acceptance for shipping" entitling CVD to payment of the second 30% installment.  In any event, the Taiwan Glass instruction pursuant to the Standby LC directed CVD to ship the entire "Continuous TCO APCVD System and Exhaust Gas System" (*id.*), not just some of its constituent parts—which, by CVD's admission, is what it shipped.

To be sure, Taiwan Glass had a duty to exercise its right to withhold "acceptance for shipping" in good faith.  In New York, every contract contains an implied covenant of good faith and fair dealing.  *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994).  "Even when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith."  *Id.*  In different circumstances—if, say, CVD had produced all the components of a conforming APCVD System, and Taiwan Glass's quibbles were less material—Taiwan Glass's right to reserve its acceptance for shipping would be more dubious.  Here, notwithstanding CVD's assertions to the contrary, no reasonable jury could conclude that Taiwan Glass acted in bad faith in withholding acceptance for shipping.[11]  CVD has failed to present sufficient evidence to demonstrate a material question of disputed fact, as the record contains no true opposition to

---

[11] In its papers opposing this motion, CVD says that Taiwan Glass's inspection was carried out in bad faith.  Specifically, CVD contends that, because the Taiwan Glass employees who conducted the inspection admitted that they lacked the authority to accept equipment for shipment, Taiwan Glass evidently never had the intention of providing its acceptance for shipment. (Pl. Opp., at 23 n.17.)  The Court fails to see—and CVD fails to explain—how that conclusion necessarily follows merely from the employees' lack of authorization for acceptance.  Had CVD produced a fully conforming APCVD System at inspection, for example, the Taiwan Glass employees might have contacted their superiors with instructions to provide acceptance for shipment.  In other words, the record does not bear out a genuine dispute about whether Taiwan Glass acted in bad faith in withholding its acceptance.

Taiwan Glass's account that it withheld acceptance because, in its reasonably held view, any shipment of CVD would not have contained the goods for which it had bargained.

Accordingly, CVD's shipment in the absence of Taiwan Glass's "acceptance for shipping" did not conform to the Agreement. *See* N.Y. U.C.C. § 2-106(2) ("Goods or conduct including any part of a performance are 'conforming' or conform to the contract when they are in accordance with the obligations under the contract."). This nonconformity afforded Taiwan Glass the right, upon tender of delivery in Taiwan, to reject the goods. *See id.* § 2-601(a) ("[I]f the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may . . . reject the whole . . . ."); *Fashionwear (PVT) Ltd. v. Regatta (U.S.A.) LLC*, 03-CV-5597, 2006 WL 695256, at *3 (S.D.N.Y. Mar. 17, 2006).[12]  Taiwan Glass did, in fact, reject the shipped goods,[13] and CVD did not seek to cure its improper tender of delivery. *See* N.Y. U.C.C. § 2-508. As a result, Taiwan Glass is owed the sum it paid to CVD at the outset of the project. *See id.*

---

[12] CVD contends that "under no interpretation of the Agreement could CVD 'tender' the online APCVD System *before* it was installed on [Taiwan Glass's] float glass line." (Pl. Opp., at 17.) This cannot be squared with the UCC's definition of tender. *See City of New York v. Pullman Inc.*, 662 F.2d 910, 919 (2d Cir. 1981) ("'Tender of delivery' occurs when the seller puts 'conforming goods at the buyer's disposition.' N.Y. U.C.C. § 2-503(1). Tender of delivery is further defined as 'such performance by the tendering party as puts the other party in default if he fails to proceed in some manner.' Official Comment to N.Y. U.C.C. § 2-503."). CVD clearly put the goods at Taiwan Glass's disposition when it shipped them to Taiwan, and—assuming the goods had been conforming—Taiwan Glass's failure to accept them would have placed it in default.

[13] That CVD was aware of Taiwan Glass's rejection of the goods is beyond genuine dispute. In its pre-trial memorandum, CVD takes the position that "[Taiwan Glass] did not take any affirmative steps to seasonably notify CVD that it had decided to reject the equipment." (Pl. PTM, at 20.) On the contrary, CVD says, Taiwan Glass "remained entirely silent, and even refused to inform CVD that it had rejected the equipment when specifically asked by CVD via letter in late January 2010." (*Id.*) This is a disingenuous argument. CVD's letter assumed Taiwan Glass's rejection; it sought a response only to the extent that Taiwan Glass did *not* intend to reject the goods. (Def. 56.1 Stmt, Ex. 19 ("This letter is to confirm that Taiwan Glass has rejected the goods. If this is not Taiwan Glass' position, please notify CVD within forty-eight (48) hours. Absent such notice, your rejection will be confirmed.").)

§ 2-711(1) ("Where . . . the buyer rightfully rejects or justifiably revokes acceptance then . . . with respect to the whole if the breach goes to the whole contract . . . , the buyer may cancel and whether or not he has done so may . . . recover[]so much of the price as has been paid . . . .").

### 3.  Late Delivery

In addition, Taiwan Glass argues that CVD breached the Agreement "by failing to deliver the contracted-for System by the contractual delivery date." (Def. Mem., at 24.)  While conceding that much of the preliminary schedule has an "aspirational, tentative tone," Taiwan Glass contends that no such tone is found in stage six of the schedule, which addresses delivery. (*Id.* at 8.)  In particular, the tasks in stage six are not—unlike every other stage—prefaced with the language "CVD expects to finish the following tasks in stage [X]." (*Id.*)  For its part, CVD concedes that shipment did not occur by the date specified in the delivery schedule, but nonetheless maintains that this timeline was based on "target dates" rather than hard and fast deadlines.  (Pl. Opp., at 19–20.)

The law in New York is that "where a definite time of performance is specified in a contract, time is of the essence unless the circumstances affirmatively indicate a contrary intent." *Kolmar Ams., Inc. v. Koch Supply & Trading, LP*, 10-CV-7905, 2011 WL 6382566, at *8 (S.D.N.Y. Dec. 15, 2011) (quoting *Sparks v. Stich*, 135 A.D.2d 989, 991, 522 N.Y.S.2d 707, 709 (3d Dep't 1987)) (brackets and internal quotation marks omitted); *accord Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 523 (2d Cir. 1990).  Here, the significance of the dates in the delivery schedule is not clear from the face of the Agreement.  While stage six lacks the provisional language elsewhere in the manufacturing schedule, the schedule nonetheless sets out "goals for each stage" without making an express exception for the delivery stage.  Moreover, Taiwan Glass accepts that the other stages of the schedule are accompanied by

an "aspirational" and "tentative" tone, and one would expect that delays in design and manufacturing would, in turn, occasion delays in delivery.  Accordingly, whether time was of the essence under the Agreement is not free from genuine dispute.

### 4.   CVD's Attempt to Collect Payment

It follows from the conclusion regarding breach above that CVD's subsequent attempt to draw down on the Commercial LC for the second installment of the contract also amounts to a breach of contract.  Not only did CVD ship without Taiwan Glass's acceptance, but it also concededly shipped only parts of the APCVD System.  CVD was not entitled to collect payment, and its attempt to do so ran afoul of the express terms of the Agreement.

### 5.   CVD's Breach Claim

Largely in light of the foregoing analysis, summary judgment is also warranted in favor of Taiwan Glass on CVD's breach of contract claim.  CVD says that its breach claim "is based upon [Taiwan Glass's] decision by at least early October 2009 that it no longer wanted an online APCVD system, and its subsequent actions to try to avoid the Agreement," including its refusal to clear CVD's shipment through customs.  (Pl. Opp., at 23.)  CVD also says that Taiwan Glass had no right to refuse the shipment because CVD was not "tendering" the goods by shipping them to Taiwan, and that Taiwan Glass breached by not carrying out its inspection in good faith.

These arguments are answered above.  Taiwan Glass was within its contractual rights in withholding acceptance for shipment and refusing to clear the shipment through customs.  Even if CVD was not in fact "tendering" the equipment at inspection, the Agreement nonetheless conferred on Taiwan Glass the contractual right to refuse acceptance under the circumstances. Taiwan Glass neither refused this acceptance, nor carried out its inspection, in bad faith.  In

short, CVD has proffered no evidence giving rise to a genuine dispute of material fact as to whether Taiwan Glass breached the Agreement.

## III.   Conclusion

For the foregoing reasons, Taiwan Glass's motion for partial summary judgment is GRANTED.  The Court orders the entry of judgment in favor of Taiwan Glass against CVD in the amount of $3,564,000, plus prejudgment interest at the rate of nine percent from the date of breach, January 10, 2010, the date on which the CVD shipment arrived in Taiwan.

The parties are directed to confer and to submit letters on or before November 19, 2014 addressing how they propose to proceed with the next phase of the case.  The Court will address those proposals at the next conference, scheduled for November 21, 2014 at 10:00 a.m.

The Clerk of Court is directed to close the motion at docket number 186.


SO ORDERED.

Dated:  November 13, 2014
        New York, New York

_____
J. PAUL OETKEN
United States District Judge